I'm going to call it Blue Cross Blue Shield of Louisiana. Mr. Herman. Good afternoon. May it please the Court. My name is Jonathan Herman, and along with my colleague, Chuck Hill, we have the privilege of representing Blue Cross and Blue Shield of Louisiana. Encompass filed two separate and distinct claims. In 2012, it filed health benefit claims. In 2013, it filed tort claims. The tort claims were based upon a 2010 letter in which Blue Cross notified 17 in-network contracted physicians that it accurately, correctly, and truthfully notified them that Encompass's services were not separately covered. Encompass had possession of the letter three days later. Its attention was so excited that it went to its lawyers to take legal action, namely to file this lawsuit. It didn't file the lawsuit then. It waited two and a half years to do so. It was during that time, I take it it was suing Blue Cross of Texas? Correct. It filed its claim against Blue Cross of Texas in 2011. And they settled that claim at some point? At some point that claim was resolved, yes. Encompass's separate claims were the health benefit claims, based upon plans that prohibit members from assigning their benefits. This Court, the Third Circuit, and the Ninth Circuit have all held that such anti-assignment clauses deprive providers like Encompass standing to sue. But before Encompass even filed its claims, Blue Cross had properly paid the physician fees that included Encompass's services as a vendor. Where is that fact established in the record? That the global fee included, necessarily included, whatever, you know, surgical accoutrements were required? The testimony of Catherine Crosby in both trials, trial number one and trial number two, both established that. In addition to which, it was also established that Encompass had always known the global fee was being applied to its claims. It knew that back long before it came to Louisiana to file claims for services. Now, of course, they say that that, I think it may even be attributed to Ms. Crosby, is that that was some kind of internal accounting or claims processing procedure that was not known by Encompass. The testimony in both trials was that the global fee was a Medicare-based methodology that was embedded in Blue Cross's payment methodology to the physicians. There is no physician and no patient, no member, that is contending that their benefits or the physicians' fees were not properly paid. No, I'm not saying that. But let me give you an example. Suppose, and I don't know what kind of surgeries these were, some kind of obstetrical, gynecological something. But if the physician did the service in his office, would Blue Cross reimburse him at a different rate than if he performed the same surgery in an ambulatory care center or a hospital? If the physician performed the service in his office, the physician received a higher rate of reimbursement that was intended to include all of the overhead associated or incurred by the physician in providing those services. And was that in the record? Yes. Where's that in the record? Again, that would be the testimony of Ms. Catherine Crosby. It is also in the record in connection with the testimony of Mr. Robert Gates, who is one of the founders of Encompass. And in that testimony, Mr. Gates acknowledged that the global fee was applicable with respect to Blue Cross of Texas, that payment methodology, prior to Encompass billing for its services to Blue Cross Louisiana. Well, right. But that doesn't necessarily mean there's a unity among all the Blue Cross providers. I mean insurers, right? Well, yes, that is true, except for the fact that every single other health insurance company stopped paying Encompass for the same reason that Blue Cross of Louisiana did. And that is in the record also in both, certainly in trial number two, with respect to Mr. Gates' testimony, who acknowledged that every single insurance company stopped paying Encompass long before it even came to Blue Cross of Louisiana. And based upon this court's precedent, no health insurance company is required to pay the same claim twice. And accordingly, Blue Cross did not abuse its discretion in denying those claims. If I fully answered your question, Judge Jones, my argument has three key components. The first is that contra non volentem cannot revive Encompass's prescribed claims. The second is that the district court erroneously granted a new trial, finding nonexistent jury confusion and conflating the tort and the health benefit claims. And then the third is that Blue Cross properly exercised its discretion. No health plan requires Blue Cross to pay the same claim twice. And the anti-assignment clause is to prive Encompass of standing the suit. With respect to the contra non volentem argument, this court's decision is governed by Eldridge v. Martin Marietta, which holds that information to excite attention and prompt further inquiry is sufficient to trigger the running of prescription. In other words, what did you know and when did you know it? What did Encompass know? Encompass knew, according to the trial testimony, that its business fell off a cliff. It was shoved off a cliff. It plummeted into the abyss. That's Encompass's testimony found at record site 8749-50 and 8731-32. When did Encompass know it? It knew it three days later on August 19th of 2010, three days after the letter was written. What did it do? It went to its lawyers for legal action. It went to its doctors. And it adjusted its own fees until it could get this lawsuit together. And that testimony is found at record site 8283. Encompass knew how to file a defamation claim. It did so one month prior to the August letter when it filed a defamation case against UnitedHealthcare. And that evidence is in the record at 4459. And it's also part of the record in connection with the motion for summary judgment, which the district court initially granted in Blue Cross Louisiana's favor in 2013. That's one month before the Cantrell letter? The Cantrell letter was in 2013. Oh, I'm sorry. Yes, the UnitedDefamation case, Judge Jones, was filed one month prior to the Cantrell letter. Are you saying that they were filed on similar bases? Yes. Record site 4459 reflects Mr. Gates' testimony that the defamation claims against UnitedHealthcare were, quote, and the communications that gave rise were similar. The Louisiana decisions of Derrick v. Yamaha, Harvey v. Amico, and the additional citations that I provided in my notice of supplemental authority that was filed this past Friday all hold that a cause of action becomes reasonably knowable when a litigant seeks counsel. That's exactly what Encompass did shortly after the letter. Well, that's only one of the factors, of course. It is the definition of one's attention being excited when one goes to visit counsel, the very definition. The nub of the issue on contra non volentem is probably best expressed by the district court when the parties were arguing the judgment as a matter of law after trial number two, and the district court asked Encompass's counsel, why didn't you file a lawsuit and issue subpoenas for the policies that you claim are at issue? That's at record site 8761. Counsel's only response was that Encompass didn't believe it could survive a Rule 11 motion, a position which it abandoned on appeal. I've been hurt, and you did it. That's what practitioners commonly recognize as the necessary requirements in order to file a lawsuit. With respect to the erroneous grant of a new trial by the district court, the issue sits on the head of a pen found at record site 5488. When the district court wrote a finding that no breach occurred would reasonably cause the jury to find that no tort liability existed because the breach of contract claim underpins the basis of the tort claims, the converse may also be true. Focusing on the word may and focusing on the words reasonably cause, there is absolutely no evidence in the record of that, of any jury confusion, speculation, question, whatever the case may be. I could argue, I could consume the remainder of my time arguing that the health benefit claims are completely different from the tort claims, but the contra non-valentum question focuses on Encompass's conduct. Did Encompass meet its burden? The tort liability question focuses on Blue Cross's conduct. And what the trial judge did after the first trial, which resulted in a defense verdict for Blue Cross, was he invaded the province of the jury, speculated as to what the jury might have been thinking, considered that the jury asked a question, but the answer to the question simply directed the jury back to the definition that was found in the instructions, in the jury charge, that it was certainly no jury confusion on that point or any other, and the two claims were not intertwined. It was error for the district court to invade the province of the jury on a predicate question, not even liability, but a predicate question that was as to whether Encompass met its burden of proof to prove contra non-valentum. And from there, everything unraveled. With respect to the erroneous grant of a new trial, the jury confusion issue, Encompass argued that arbitrary and capricious takes it to a higher standard. It has to meet a higher level of proof, not the way the jury charge was drafted. The words arbitrary and capricious were a defined term that simply related back to 22-1821. But you're not contending anymore that the prompt payment statute applied here, are you? We have always contended that the prompt payment statute was applicable with respect to the non-ERISA plans. Okay. We have ERISA plans and non-ERISA plans. I guess it's because I didn't think that was a very serious contention. In other words, both the second judge, at least, found that the prompt payment statute is there to assess penalties  But if it's simply a breach of contract and they're not asking for the enhanced fees, then the prompt payment statute doesn't apply. That's Encompass's argument, and the hollowness of that argument is reflected in the actual jury charge that Encompass proffered in Trial No. 2. The charge was Blue Cross did not have just and reasonable grounds to delay or deny payment. And no, that phraseology is directly taken from 1821. So Encompass argued in the first trial, in the charge conference and ultimately afterward, that it should not be held to this prompt payment statute standard. But when it came back in Trial No. 2, it wound up using the exact – it proffered a jury charge that was actually based and grafted language from the prompt payment statute. Arbitrary and capricious in the first trial was simply the defined term used to reflect does not act in a reasonable manner based upon facts known at the time of decision. There is no daylight between those two phrases. But this is wrapped up in your contention that a new trial should have been – Yes. The jury – I'm sorry, the trial judge in the first trial twice overruled Encompass on its objection to that charge pre-jury deliberation. The jury comes back, rendered its verdict. The trial court says, well, I'm going to sustain the objection at this point. I'm about out of time. My third argument is simply related to the anti-assignment clauses and that Blue Cross did not abuse its discretion. And I'll preserve my remaining time for rebuttal. All right. Thank you. We'll hear from Ms. Eklund. Ms. Eklund. May it please the Court, there are a couple of misstatements of fact that Mr. Herman made that I want to draw some attention to. The first is the idea that it was an undisputed fact at trial that the physicians were paid a global fee. This was the very crux of the dispute at trial as to whether that fee was actually a global fee and what global fee actually meant. Were they paid more or were they not paid more? They were paid more, but not anything approaching what an ambulatory surgery center would be paid for the services associated with anesthesia. Of course not. Of course not, because that's embedded in their overhead. What was established at trial as well is that most doctors do not have the capacity in their offices to provide the services that are required under Louisiana law when anesthesia is administered. Those involved specially trained nurses who are trained in advanced cardiac life support. It involved all the equipment associated with administering anesthesia. It involved various machines that would be necessary for resuscitating a patient if the anesthesia had gone awry during the procedure. What the overhead was typically for most procedures that encompassed it was around $40 to $50. And that additional fee was supposed to pay the provider for all of the services that I just described that an ambulatory surgery center would provide. Wait a minute. You're saying that the in-office reimbursement to the surgeon was only $50 more than if he had performed it or she had performed it in a hospital? With most of the procedures that Encompass performed, that was the case. With a couple of those procedures, a very high-dollar device was required to conduct it, and that part was included in the overhead component for those codes because it couldn't be conducted without that particular device. The distinction established at trial was that Encompass was necessary if anesthesia was going to be used. Doctors can perform several of these procedures in their offices without anesthesia. The question is, when is anesthesia medically necessary for the patient? When the doctor made the decision that anesthesia was medically necessary, they would use Encompass, and there the costs expanded because it wasn't just the lights and the walls and the check-in that the doctor had to cover. It was all the anesthesia accoutrement. It was all of the supplies that were required for that. It was advanced cardiac life support nurses, none of which are typically on staff or present in a doctor's office. That was the ultimate issue at trial, and I just wanted to make sure that in terms of what the facts provide here today, there's not a confusion as to the global fee. What was also established at trial is that not one witness from Blue Cross, with the exception of Ms. Crosby who testified that this was embedded in their methodology somehow because it was premised on Medicare, not one witness at trial, and Ms. Cantrell specifically, both in her deposition and at trial, confirmed that there is no written policy at Blue Cross with regard to any global fee paid to physicians. There's nothing written down. In fact, one of the other witnesses whose e-mail became admitted to evidence at trial said amongst other Blue Cross executives, I don't know why we're not contracting with these people. It doesn't appear to me we have any kind of policy on this. That all was evidence presented at trial as well, which undermines the idea here today that the global policy was a foregone conclusion. But you said that, I think I read in the briefs, that the Texas Blue Cross policy had some specific differentiation. Blue Cross Texas implemented a policy during the pendency of the lawsuit against them that would exclude providers like Encompass. They rewrote a new policy and implemented it during that time. That's the policy that Blue Cross Louisiana claimed is their own in their pleading that was then submitted as the first amended counterclaim. Okay. Well, what I'm very interested in is contra non volentum, which I've encountered a number of times. And focusing on the August 10th letter, it said, Blue Cross limits its reimbursement. This is the letter to the doctors. The policy limits reimbursement to licensed providers, which Encompass was not. That it pays a global fee to the MD for doing the surgery in his office, which he said it does not. And that it threatened to drop the doctors, although it had no right to do that because they were making a medical decision to use Encompass. So there are at least three alleged falsehoods from Encompass's perspective in that August 10th letter, right? I believe one that was not included. That's right. But I believe one that wasn't included in the list that you recited that is included in the brief is the idea that they were ineligible to participate in Blue Cross's networks. All right. So four falsehoods, four inaccuracies in that letter. Encompass gets its lawyers involved within three days of that letter. Encompass tries to call Blue Cross immediately and more than once to get clarification, but there's no response. And Encompass, according to them, says its business dropped off a cliff in Louisiana. Why wasn't that enough to excite attention that mere errors could be worse than errors? I mean, it seems to me the facts are the facts, and whatever claims they may raise are to be discovered definitively during litigation. Because the ultimate error that Encompass did know about at that time was that they believed that the benefit plans entitled them to payment. That had nothing to do with Blue Cross's internal reimbursement policy. Well, of course they were entitled. That's the whole point. I mean, it's a breach of contract at the very least, but you're saying that you had the feeling that your client had never seen the policy, they couldn't gain access to Blue Cross, and here are all these things that are being said that they don't think exist because, after all, Texas had just changed its policy during the course of the litigation, and yet you don't encourage them. Now he says you just filed a defamation suit against another insurer. I don't understand why the excitement wasn't elicited by all of this group of circumstances. Well, there are two things in response to that, Your Honor. One is they did not have any idea that those statements with regard to Blue Cross's policies were errors. They had no relation to this. Well, if they weren't errors, then Encompass should have walked away and not done any more business. If the open question in the ---- You can't have it both ways. You can't say that you knew you had enough evidence or enough belief that these amounted to a breach of contract on the one hand, but you did not have enough to say, well, that means that somebody's lying. Your Honor, what differentiates those two things is that Encompass would have a right to be reimbursed if the policies were not incorporated into the benefit plans. The question was did the plans provide for whether, through their specific terms, whether they provided for Encompass to be reimbursed. They had an idea that that was incorrect. The other statements with regard to eligibility to participate in the network and the other list that you recited, Your Honor. Licensure. I'm sorry? Licensure and global fee. Licensure and their ability to terminate the doctors. These were all things that they had no idea that they needed to be excited about. What they understood that letter to say ---- Well, excuse me. I mean, you said it was a breach of contract because there was no global fee. They had no global fee to the doctors. Well, shortly after receiving that letter, they called up some of the doctors to talk to them, right? They could have said, and they had lawyers, oh, are you being paid a global fee? Are you being paid more in office than you're being paid at the ambulatory surgery center? And the doctor would have said, it depends on what my medical judgment is, right? I mean, the whole thing is just sitting there ripe for the plucking for a tort claim in addition or in alternative to a contract claim. There are two points with regard to that position as well. One, the global fee was not a misrepresentation that Encompass took from that letter. That letter said that the doctor should accept their fee as payment in full for the services provided. They understood that that was Blue Cross's position. They didn't know one way or the other whether they were paying a global fee at that point in time. But that misrepresentation wouldn't have damaged Encompass. If that piece was true with regard to whether Encompass was entitled to payment, that would be based upon the contract and the member plans, which would have precluded their payment to begin with. There was no indication that a statement had been uttered that was false. They filed suit for breach of those contracts and plans, did they not? They did. And Blue Cross refused to give them access. I mean, if I call somebody, you know, if an air conditioner fellow has done repairs at my house and I don't think the repairs are good, and then I try to call him two or three times and he doesn't answer back, then what am I to think? Well, he might have been just breaching his agreement with me, or he might be a fraud. Fly by night. And I start making inquiries. So that's, I find, I just don't quite, and I was disturbed that Judge Lins, I think this is her opinion on rejecting the new trial or JMOL or something, cited one sentence of the Eldridge opinion and didn't cite the following sentence. Your Honor, I think what's important about the Eldridge opinion is another piece of it, which specifically provides that a plaintiff has to have actual or constructive knowledge of a tortious act. They knew about the statements, for sure, but they had no reason to believe that those statements were false. And falsity is the most essential element of a defamation action. Without a basis to know that those are false, you couldn't, in good faith, file a claim in federal court. I'm not going to belabor your, I'm not going to belabor this anymore, but I thought you had just more or less agreed with me that these statements were inaccurate at best, so. They were determined later to be inaccurate at best, and that is the crux of the argument on contra non volentem. There was no reason to believe that the statements were false until the policies were requested in the lawsuit, and then a witness confirmed under oath that they didn't exist. Well, let me, you know, I'm sorry, I'll just refer you to one thing that, in candor, that affected my thinking here, and it was a case that I sat on just about a year ago called Mercado Alizio, and I, unlike usual, maybe I should give you all the citation. It's unpublished, but it was unpublished because there was a letter circulated. The plaintiffs had reason to believe that the letter was false, but they never inaccurate or whatever, but they didn't file suit for several years, and the panel did not even deem it worthy of publication to affirm the district judge, which held that contra non volentem didn't apply. In the circumstance, though, the piece of contra non volentem that we haven't talked about yet today is the question of reasonableness of the plaintiff's action or inaction following the attention being excited. That is the standard since Jordan that what has to be determined by the fact finder is whether the actions of the plaintiff were reasonable after that point. There was ample evidence in front of the jury that those actions were reasonable. They understood that they called, that the plaintiff called repeatedly looking for the policies. They understood that a lawsuit was filed and discovery was begun in that lawsuit that would request policies. They understood that Blue Cross Louisiana filed a pleading with the court saying that such a policy existed and even quoted from it. And then Encompass did not find out until a month later at the depositions of their executives that no such policy existed. But you didn't. You didn't. And again, it's don't want to. The other issues aren't as critical as this one in a way, but you did not say that they fraudulently concealed. We did not say in our pleading that they fraudulently concealed. But that's sort of what you're arguing in saying that their pleadings misrepresented things consistently. I'm saying that the that the contra non-valentum argument is informed by whether something was concealed. And that didn't need to be a part of the pleading when we pled defamation in order for it to be accurate here on a determination for contra non-valentum. That even the very cases cited by Blue Cross, Safford and Nere, both specifically state that there was if there was any evidence that they had been prevented from obtaining that information, that the result may be different. And here there is ample evidence that they were prevented from obtaining the information. They had no access to the policy manual. They called to try and talk with Blue Cross about whether or not there was something that could be worked out between provider and Blue Cross. They undertook discovery in a breach of contract lawsuit and requested that information. Thereafter, a pleading was filed with the federal court that misrepresented the policy and only at the deposition did they learn. That was the evidence that was in front of the jury when they were making a decision as to the reasonableness of encompasses actions, which is the standard under contra non-valentum. Because there was ample evidence and because the question on a J-Mall is whether there was legally sufficient evidence supporting that verdict, the jury's province there should not be disturbed because of the the only evidence in support of Blue Cross Louisiana's position is that an attorney was consulted. And none of the cases cited by Blue Cross specifically to argue that there should be a per se rule that when a lawyer gets involved, the claim runs. The cases cited by Blue Cross do not so provide. Those cases specifically provide that a lawyer may be a factor in that process, but Dominion, upon which Blue Cross relies heavily, specifically talks about a circumstance when an attorney had been engaged but only received documents during the discovery process later on that informed him of the additional claim. And the court found that contra non-valentum ran from the day that they got those documents to inform them of their cause of action. It wasn't the hiring of an attorney upon which any of those cases relied. It was upon the knowledge that the attorney had that was then imputed at the client. And let me just clarify. You're going under the fourth circumstance of contra non-valentum according to the Lamont case. I believe both the third and the fourth prongs are applicable. Well, which one did you argue in the trial court? In the trial court, we argued the fourth prong. That's what I thought. Okay. On contra non-valentum, though, the whole proposition of that rule is to prevent or to argue that until a plaintiff can reasonably know they have a claim, that limitations shouldn't start to run against them or prescriptions shouldn't start to run against them. To find otherwise here today would be to establish that any time a plaintiff receives any statement without any indication of falsity or any reasonable reason to believe that those statements are false, that they would need to file a suit as a fishing expedition in order to get the information that would support that claim. The federal rules are very clear with regard to the good faith basis required to initiate any claim. And because of the subjective belief of Encompass that was established at trial, they had no reason to assume that Blue Cross was going to misrepresent its own policies to its network doctors for purposes of convincing them not to work with Encompass. There isn't a per se rule under the case law, as I mentioned before, and to find on Blue Cross' behalf, based on that alone, would be a new precedent to set in the Fifth Circuit. The inquiry is, as I mentioned, is when the plaintiff had information sufficient to excite attention and was their action thereafter reasonable. Blue Cross ignores the second prong of that test in their briefing and argument to the Court. As to the motion for new trial, the standard there, of course, is abuse of discretion. They argue specifically that the tort claim, there was no evidence to suggest that those claims were intertwined. But it's important to note that the default for a standard for new trial is a default on all new trial on all claims, and the claim should only be severed when one issue could have in no way influenced the verdict on the other issues. Here, the arbitrary and capricious addition to the breach of contract instruction was clearly erroneous based on Louisiana and Fifth Circuit precedent. There is a distinction between entitlement to benefits and entitlement to penalties. Well, I mean, he says that you – that the jury charge in the second trial was exactly the same as the one in the first trial. That is not accurate, Your Honor. The jury charge in the second trial, the breach of contract question, was the question that Encompass proposed that it not include the arbitrary and capricious standard. Judge Lynn let a question go to the jury, which was 1B, which she specifically stated that she didn't think was right when she – she let it go to the jury. And that was a question of whether there was a preponderance of the evidence that the just and reasonable standard had been met. The jury answered that question in favor of Encompass. So there was a question that Blue Cross proposed that went to the jury, but they answered Encompass's favor in the second trial as well. Encompass didn't proffer the just and reasonable instruction for – they believe, we believe, that the breach of contract was separate and apart from whether or not there was a standard met for penalties to be assessed. Claims for tort – we don't know what the jury would have thought with regard to the question was asked and the order in which it was asked, it presupposed that the statements in there would be – were false or would be false. Charged incorrectly on the contract question, the jury would have to then take that conclusion into account when they were considering the tort claims. If they found that Blue Cross was not entitled to payment in the first place, then the defamation claim looks very different to a jury, potentially, either because they don't believe the statements are false based on the erroneous breach of contract or they don't believe that there was any injury or damage. We can't know what the jury was thinking when they made that decision, but we do know that they asked about the arbitrary and capricious instruction as a part of their deliberations. The default standard there – and Blue Cross did not ask for severance at any point of the claims in terms of the new trial that was granted. The default standard there is a trial as to all claims unless it can be affirmatively established that there's no chance that the answer to one infected the others. Okay. Thank you. Mr. Herman, Revetil. May it please the Court. Jonathan Herman on behalf of Blue Cross Blue Shield of Louisiana. One quick point. If you were to lay side by side the jury charge on the trial No. 1 to trial No. 2, the charge in trial No. 1 asks the jury whether Blue Cross did not act in a reasonable manner based upon facts known at the time of decision. Trial No. 2, Blue Cross did not have just and reasonable grounds to delay or deny payment. The language that I just quoted from trial No. 2 is directly taken from 22-1821, the prompt payment statute. That was the statute which Encompass vociferously objected to and got into a debate with the district court in the first charge conference – the charge conference for the first trial where the court was somewhat incredulous that you could split the statute and get out of the ambit of the statute in order to avoid the effect of the statute on the language. Every single one of the claims was denied or virtually all the claims were denied as part of another service. There's a series of spreadsheets that were trial exhibits that are in the record. Well, I don't quite understand. You're not here to argue the contract case again, are you? No. All right. I'm simply – it goes to the global fee. The denial of the claim was based upon denial as part of another service, i.e., it's a duplicate claim. The court asked initially in my opening about some testimony on the global fee. I'd refer the court to ROA 8734-35 and 8746-47. That's the testimony where Mr. Gates acknowledges that he was aware of the global fee. I'll point out very briefly that a tortious interference claim, which is the second of the tort claims, does not have any element of falsity attached to it. It's a standalone tort claim that if the letter was anything and Encompass is contending that the letter tortiously interfered with its business, that is a one-year statute of limitations prescriptive period. If the one-year prescriptive period runs from the date of the letter or three days later when Encompass knew of it, then that same prescriptive period equally applies to the defamation claim. There's a site in the record below, 8207-8208, where the Texas Department of Insurance informed Debbie Woods, another founder of Encompass, to direct Bill the doctors. Your remedy is as against the doctors, not as against the insurance companies. For all of its complaints about what Blue Cross did, the one thing that Blue Cross did not do was prevent Encompass from rendering services to the doctors as a vendor. This was conceded by Mr. Gates at ROA 8732-33. Encompass could still perform its services to the doctors as a vendor. It simply couldn't bill Blue Cross. Blue Cross and the doctors had a duty to protect the members from the separate bill, and it's on that basis that the global fee is applicable, and Blue Cross properly denied the claims. Does Encompass still exist? I mean, its brief starts out by saying it obtained licensing, but I just wondered. I do not believe Encompass is licensed at all. Well, I said, well, do they still exist? I don't know the answer. Oh, just wondering. Okay. The global fee that you keep referring to and relying upon was, as I understand it, not a written provision in the Blue Cross policies. Well, it's embedded. That was the genesis of the problem, that it's not in the policies. It's some universal understanding in the Blue Cross world. Well, it would be in the understanding as between the physician and Blue Cross. And how's that proved, the understanding? It's not in the policy. Well, you don't pay twice. That's where the understanding is. I mean, if the physician does a blood test in his own office, you pay him for doing the blood test in his office, but if he sends it out to the contractor, then the contractor may or may not be able to bill the insurer. Isn't that what you're saying? Yes, Your Honor. I see I'm out of time, if I may spend a sentence or two in conclusion. The district court reversed itself three times, resulting in two unnecessary jury trials. Blue Cross would simply ask that this court reverse the district court's judgment and render judgment in favor of Blue Cross Louisiana on its JMOL, or alternatively reverse the district court's grant of a new trial, enter judgment on the first jury's verdict, as well as reversing the district court's judgment on the ERISA claims and enter judgment consistent with the first jury's verdict. Thank you. Okay, thank you very much.